·572 A.2d 798

George F. GRODE, Insurance Commissioner of the
Commonwealth of Pennsylvania, Plaintiff,

v.

The MUTUAL FIRE, MARINE AND INLAND INSURANCE
COMPANY, Defendant.

Commonwealth Court of Pennsylvania.

Heard July 25, 26, 28, and Aug. 1, 1989.

Decided Jan. 23, 1990.

Publication Ordered Feb. 13, 1990.

As Amended Feb. 26, 1990.

Robert H. Levin, Adelman, Lavine, Gold and Levin, with him, Henry L. Shrager, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, for the Rehabilitator.

Richard A. Brown, Spiegel & McDiarmid, Washington, D.C., with him, David H. Weinstein, Kohn, Savett, Klein & Graf, PC., Philadelphia, for Policyholder Committee.

Henry B. FitzPatrick, Jr., with him, Marcy B. Tanker, FitzPatrick & Tanker, Media, for Cedent Committee.

Joseph A. Dworetzky, Drinker, Biddle & Reath, Philadelphia, for General Acc. Ins. Co. of America.

Richard B. Wickersham, Baskin, Flaherty, Elliott & Mannino, P.C., Harrisburg, for David Carl Ashcroft.

Edward F. Mannino, with him, James D. Morris, Baskin, Flaherty, Elliott & Mannino, P.C., Philadelphia, and David M. Raim, Chadbourne & Parke, Washington, D.C., for Republic Insurance Company.

David L. Harbaugh, Morgan, Lewis & Bockius, Philadelphia, for Ingersoll–Rand Financial, et al.

Marc B. Merklin, Brouse & McDowell, Akron, Ohio, for Allstate Ins. Co.

Edward C. German, with him, Kathleen Carson, German, Gallagher & Murtagh, Philadelphia, for Shand–Morahan, Evanston Ins. Co. and RLI Ins. Co.

David T. Sykes, with him, Jill A. Whitworth and Lisa R. Jacobs, Duane, Morris & Heckscher, Philadelphia, for Fidelity Bank, N.A.

Eric A. Schaffer, Reed, Smith, Shaw & McClay, Pittsburgh, for Mellon Bank (East).

David L. Cohen, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, for Colonial Penn Ins. Co.

Richard H. Martin, Astor, Weiss & Newman, Philadelphia, for John A. Matlack.

Edward C. Mengel, Jr., White and Williams, Philadelphia, for Ronald G. Aller.

Thomas C. Zielinski, Cozen and O'Connor, Philadelphia, for Edward M. Bowers.

Veronica Winter Saltz, Saul, Ewing, Remick & Saul, Philadelphia, for William F. Howes, Jr.

James J. Black, III, Philadelphia, for Alfred B. Pentony and Richard P. Klopp.

Scott A. Petri, Liederbach, Hahn, Foy & Petri, Richboro, with him, John E. McGovern, for Calder Race Course, Inc.

Laurie R. Hines, Frumkin, Shralow & Cerullo, Philadelphia, for Jonathan Snell, SWB Trust as Trustee.

John F. Finston, LeBoeuf, Lamb, Leiby & MacRae, Washington, D.C., for Skandia America, Terranova, and Certain Underwriters at Lloyd's.

Robert J. Donaghy, Robert J. Donahgy & Associates, Philadelphia, for Pepsi–Cola of Charlotte.

Sandra Spooner, Dept. of Justice, for U.S. Government.

Ralph Jacobs, with him, Bebe Kivitz, Hayle, Morris & Kerr, Sp. Counsel to the Commonwealth Ins. Commissioner, as statutory Rehabilitator.

## OPINION

CRUMLISH, Jr., President Judge.

Constance Foster, Commonwealth Insurance Commissioner, as statutory Rehabilitator (Rehabilitator), has petitioned this Court for approval of her modified Plan of Rehabilitation (Plan) for The Mutual Fire, Marine and Inland Insurance Company (Mutual Fire), a mutual casualty insurance company created and chartered under the laws of Pennsylvania. Commissioner Foster seeks this Court's approval pursuant to Section 516(d) of Article V of the Act of May 17, 1921, P.L. 789, *as amended*, added by the Act of December 14, 1977, P.L. 280, 40 P.S. § 221.16(d) (known as The Insurance Company Law of 1921 (Act)). We modify the Plan in part and hereby approve it.

Before proceeding with disposition of the Plan and the various objections thereto, we briefly summarize the events leading to this decision.

Mutual Fire, founded in 1902, was primarily a property and casualty insurance carrier for most of its history. In the late 1970's, Mutual Fire, along with others in the industry, became more heavily entrenched in reinsurance arrangements with other carriers. Generally speaking, under these arrangements, Mutual Fire ceded a portion of its business to other insurers who agreed to protect Mutual Fire from the risks it undertook. Conversely, Mutual Fire assumed business from other insurers under the same or similar agreements. By the mid–1980's, between 60% and 70% of Mutual Fire's business entailed reinsurance, involving over 8,000 agreements or "treaties" worldwide. At approximately that time, Mutual Fire also wrote a large number of surety bonds as part of financing packages for oil, gas and real estate limited partnerships. In addition, Mutual Fire's "direct book" liability coverage began to show diminishing profitability.

We need not dwell too long, however, on the causes of Mutual Fire's financial straits for purposes of this determination. Suffice it to say that at year-end 1988, immediately before the present Plan was proposed, Mutual Fire's deficit was over $400 million, constituting the country's fourth largest insurer insolvency.[1]

## THE 1987 PLAN OF REHABILITATION

In December 1986, George F. Grode, then Commonwealth Insurance Commissioner, sought, with the consent of Mutual Fire's officers and directors, appointment as Rehabilitator of Mutual Fire, Section 515(a) of the Act, 40 P.S. § 221.15(a), and submitted a rehabilitation plan. Prior to his petition, Commissioner Grode had placed Mutual Fire under his supervision. Section 510(d) of the Act, 40 P.S. § 221.10(d).[2] At the time the petition was filed, Mutual Fire

1. McLeod, "New Mutual Fire Rehabilitation Plan Proposed," *Business Insurance,* March 6, 1989, at 3.

2. The supervision order was entered September 13, 1986. Such orders enjoin the insurer from disposing, conveying or encumbering assets; withdrawing bank accounts; lending or investing funds; transferring properties; incurring debts or other obligations or entering any new reinsurance contracts without prior approval. 40 P.S. § 221.10(d).

reported assets of $99.4 million and total liabilities of $260.1 million, with a negative policyholders surplus of nearly $161 million.[3]

When it became apparent to this Court that adequate notice had not been given to policyholders and other creditors on whom the original plan would have a direct and substantial impact, hearing on its approval was continued generally. At the same time, we directed the Insurance Department to prepare a notice of hearing to be sent to all known policyholders and creditors indicating the procedure for obtaining the plan and raising objections prior to a Court hearing on its approval. Thereafter, many objections were made. These objections were drawn from individual policyholders, claimants against policyholders, reinsurers doing business with Mutual Fire, creditors and agents of Mutual Fire.

In early 1987, upon application of several policyholders, also objectors to the plan, this Court formed a Committee of Policyholders (Policyholders Committee), whose purpose was to "consult with the statutory rehabilitator on the administration of this matter and advise those represented as to the proposed plan." [4] This Court formed the Policyholders Committee with the express intent of assuring that policyholders *first and foremost* suffered the least amount of harm resulting from the unfortunate series of events culminating in this insurance company's reorganization effort.[5]

3. Annual Statement 1986, Exhibit No. 7, 7/26/89.

4. Order of January 28, 1987.

5. The liquidation provisions of Article V elevate the "claims under policies for losses wherever incurred, including third party claims, against the insurer for liability for bodily injury or for injury to or destruction of tangible property which are not under policies ...," Section 544(c) of the Act, 40 P.S. § 221.44(c), to the highest priority of distribution after wage claims, 40 P.S. § 221.44(a), and administrative expenses, 40 P.S. § 221.44(b). Although there is no Pennsylvania authority directly on point, we agree with decisions in other jurisdictions construing similar insurance insolvency statutes that the equitable purpose of rehabilitation and liquidation is to protect *first of all* consumers of insurance. *See, e.g., State ex rel. Long v. Beacon Insurance Co.,* 87 N.C.App. 72, 359 S.E.2d 508 (1987).

The Rehabilitator, now Commissioner Foster, thereafter filed her responses to the objections to the proposed rehabilitation plan. The Policyholders Committee and numerous other parties strenuously objected to this proposed plan on the grounds, *inter alia*, that the Rehabilitator had released no financial information or documentation to substantiate the projections of 100% payment to policyholders contained therein. Hence, this Court ordered the Rehabilitator to allow the Policyholders Committee and all interested persons access to Mutual Fire's books and records. A hearing date was then set for June 3, 1987.

At that hearing, various stipulations by and among the objecting parties (including the Policyholders Committee) were entered. The proposed plan was approved, subject to those stipulations, which altered it materially but in a manner not pertinent to this discussion.

Several months later, the Rehabilitator, pursuant to this Court's Order approving the proposed plan, filed a report on the progress of the rehabilitation for the period December 8, 1986 (the date on which the statutory Rehabilitator was appointed) to October 26, 1987. At the same time, the Rehabilitator sought additional time to evaluate the feasibility of its implementation. We granted the Rehabilitator's request for additional time and directed her to submit to the Court a schedule of tasks to be performed in order to complete the evaluation.[6] Among these tasks were the engagement of litigation counsel to investigate possible causes of action by the Rehabilitator on behalf of Mutual Fire, Section 516(c) of the Act, 40 P.S. § 221.16(c); the appointment of a professional firm to perform actuarial analyses of Mutual Fire's loss reserves; and the engagement of auditing and claims settlement services, Section 516(b) of the Act, 40 P.S. § 221.16(b). At that time, the Rehabilitator opposed the Policyholders Committee's motion to appoint an independent manager to oversee the rehabilitation on site.

6. Order of October 27, 1987.

On May 2, 1988, the Rehabilitator filed her report on the feasibility of implementing the amended plan approved June 26, 1987. After close consultation, pursuant to Section 515(c) of the Act, 40 P.S. § 221.15(c), this Court and Commissioner Foster determined that any viable rehabilitation of this magnitude would necessarily demand sufficient legal, managerial, financial and technical resources. It was therefore decided that initially a deputy rehabilitator would be appointed, Section 516(a) of the Act, 40 P.S. § 221.16(a), and legal counsel would be retained to investigate possible sources of recovery through litigation where litigation was deemed fruitful to collect the recoverables comprising a significant portion of this estate's assets.[7]

On June 1, 1988, having reviewed the Rehabilitator's report on plan implementation, which indicated the 1987 plan was not feasible for several reasons, we directed the Rehabilitator to submit a modified plan.[8] The plan was to include a provision to trigger applicable state insurance guarantee funds (both in Pennsylvania and other states) and a provision for proportionate periodic payments of policyholder claims. Additional counsel was hired to assist the Rehabilitator in formulating a modified plan.

Thereafter, the Rehabilitator applied to this Court for approval to suspend payment of certain loss adjustment expenses incurred under Mutual Fire's obligations to defend its insureds. The Rehabilitator also asked this Court for a

7. Since that time, the Rehabilitator has by writ of summons or complaint instituted legal action against, *inter alia*, Peat, Marwick, Main & Co., seeking damages of in excess of $350 million; GET Reinsurance Limited, seeking damages in excess of $13 million; the Berwind Corporation for 18 U.S.C. § 1962 ("RICO") violations, fraud and other causes of action. The Rehabilitator has also brought suit against Chesapeake Insurance Company, Ltd.; and Keswick & Curran, Incorporated. Additional litigation will be commenced when it is determined to be in the best interest of the estate.

8. Order of June 1, 1988. In her feasibility report, the Commissioner indicated, *inter alia*, that reserves on a portion of Mutual Fire's direct book were substantially in excess of estimates assumed in the 1987 plan; that collection of reinsurance recoverables would require resort to protracted litigation; and that an assumed favorable resolution of Mutual Fire—"Resolute Re" arbitration had not at that time occurred.

determination that Mutual Fire was insolvent.[9]

The Rehabilitator submitted a new Plan of Rehabilitation January 31, 1989. After notice was issued to policyholders and all known creditors and was published in periodicals of general and industry circulation, numerous objections were filed. This Court, over the course of four days, heard testimony and argument in support of and against certain provisions of the Plan. It is this Plan and the objections filed thereto which we now address.

## REHABILITATION v. LIQUIDATION

■ Objections to the Plan were raised on the grounds that it is, in name only, a rehabilitation and is in effect a liquidation. The objectors argue, therefore, that the Rehabilitator should be ordered to liquidate Mutual Fire. Several objectors maintain that it is anomalous to rehabilitate an insurance company that has been determined insolvent. We are not persuaded by their arguments, however.

Initially, we recognize that insolvency is one of several expressly enumerated grounds on which an order of rehabilitation may be based. Section 514(1) of the Act, 40 P.S. § 221.14(1). Thus, the statute admits of circumstances in which insolvent insurers are to be rehabilitated. *See, e.g., Insurance Department v. Safeguard Mutual Insurance Co.,* 18 Pa.Commonwealth Ct. 195, 336 A.2d 674 (1975), *aff'd as modified,* 478 Pa. 592, 387 A.2d 647 (1978).

The statute authorizes the *Commissioner to petition the Commonwealth Court* for liquidation, Section 517 of the Act, 40 P.S. § 221.17, and an order to liquidate requires notice and hearing. Section 520 of the Act, 40 P.S. § 221.20. The Rehabilitator has not put forth such a petition.

9. On February 3, 1989, this Court, after examining Mutual Fire's records, determined it to be insolvent as that term is defined in Section 503 of the Act, 40 P.S. § 221.3. We expressly declined to make a finding as to when Mutual Fire became insolvent. This determination of insolvency triggered guaranty fund association coverage.

Moreover, we agree with the Rehabilitator and, at least one objector to the Plan, that the benefits of rehabilitation—its flexibility and avoidance of inherent delays—are preferable to the static and cumbersome procedures of statutory liquidation. The statute's purpose is, in the end, that to which we must give effect. That legislatively stated purpose is "the protection of the interests of insureds, creditors, and the public generally...." and the "equitable apportionment of any unavoidable loss" through, *inter alia,* "improved methods for rehabilitating insurers...." Section 501 of the Act, 40 P.S. § 221.1. No interest is served by adding to the delay which has already occurred in this case. On the contrary, the goals of Article V of the Act are better served by a rehabilitation which effectively ensures more distribution in a shorter period of time than would occur in liquidation. *See Neblett v. Carpenter,* 305 U.S. 297, 59 S.Ct. 170, 83 L.Ed. 182 (1938).[10]

Notwithstanding those objectors' protestations that this is a *de facto* liquidation, we find nothing in the statute precluding the Rehabilitator from pursuing this rehabilitation as an improved method for rehabilitating insurers, particularly where the record indicates that affected persons, including the objecting creditors, would, *at least in terms of amounts* recovered, fare better under this rehabilitation than in statutory liquidation. Rehabilitator's Exhibits Nos. 5 and 6, 7/25/89.

The Plan itself calls for Mutual Fire's possible corporate restructure, and Mutual Fire will maintain its required capital and surplus minimums. The record also indicates that rehabilitation will preserve the value of Mutual Fire's insurance charters and perhaps the even greater value of operating losses. Notes of Testimony (N.T.), 7/25/89, pp. 88–90. This Court is aware of at least two instances where potential buyers have approached the Rehabilitator's depu-

**10.** Objectors rely in *Neblett* for the proposition that the Rehabilitator cannot fashion a Plan which does not give a party in rehabilitation the same or greater *rights* than he would have in liquidation. The effect of this principle on the Rehabilitator's proposed Plan will be discussed later in this opinion.

ty. N.T., 7/25/89, pp. 151–152. Of course, no one disputes that the rehabilitation as proposed contemplates the windup of Mutual Fire's current business, but it is not altogether accurate to say that the Rehabilitator intends no rehabilitative purpose. It must be remembered that Mutual Fire's assets, liabilities and operations were of a far smaller order of magnitude prior to the expansion of the reinsurance and surety bond business in the late 1970's and early 1980's.

This Court has held that the Act itself evidences the General Assembly's intent to treat rehabilitations and liquidations as separate, distinct proceedings. *Muir v. Transportation Mutual Insurance Co.,* 105 Pa.Commonwealth Ct. 156, 523 A.2d 1190 (1987). The differences between the rehabilitation and liquidation provisions are readily apparent. The liquidation provision fixes the rights and liabilities of the insurer and its creditors as of a date certain, Section 521 of the Act, 40 P.S. § 221.21; the rehabilitation statute is silent on this matter. The liquidation provision establishes an order of distribution, Section 544 of the Act, 40 P.S. § 221.44; the Act's rehabilitation section does not. Significantly, the liquidation provision expressly allows for set-offs, Section 532 of the Act, 40 P.S. § 221.32; no such mention is made in that part of the statute governing rehabilitations.

 The lack of express direction governing rehabilitations where it is otherwise given in liquidation proceedings compels the conclusion that the Insurance Commissioner, as Rehabilitator, is given broader discretion to structure a rehabilitation plan than is given to her as statutory liquidator. *Id.* In limiting this discretion, the General Assembly has given this Court, by virtue of the Judicial Code, 42 Pa.C.S. § 761(a)(3), and Section 504(a) of the Act, 40 P.S. § 221.4(a), the jurisdiction and authority to oversee rehabilitation proceedings in this Commonwealth. The Court may "approve ... disapprove ... or modify" a plan proposed to it. 40 P.S. § 221.16(a). We are aware, however, of the well-settled principle that judicial discretion may not be substituted for administrative discretion. *Blumenschein v.*

*Housing Authority of Pittsburgh,* 379 Pa. 566, 109 A.2d 331, (1954), *appeal dismissed,* 350 U.S. 806, 76 S.Ct. 68, 100 L.Ed. 724 (1955).

■ Thus, we perceive that the Rehabilitator's broad powers in these proceedings are circumscribed by this Court's mandate to act as a check on potential discretionary abuse and to insure equitable apportionment of loss. Of course, the Rehabilitator is constrained by constitutional mandate.

As has been noted, many objectors rely on *Neblett* to urge that the Rehabilitator has abused her discretion in fashioning a plan which affords to interested persons less rights than those they would enjoy in liquidation. Without conceding that the proposed Plan has this effect, the Rehabilitator agrees that *Neblett* requires claimants be treated the same or better than in liquidation. We shall not belabor this point except to agree with the parties that the Plan must also be viewed in the light of this principle.

## IMPAIRMENT OF CONTRACTUAL RIGHTS

Several objectors contend that the Plan unlawfully impairs their various contractual rights. This Court finds that these alleged impairments are, for the most part, insubstantial and do not warrant modification of the Plan except as hereinafter provided.

The Act and caselaw implicitly recognize that contractual terms are not sacrosanct when an insurance company is insolvent. *See Vickodil v. Insurance Department,* 126 Pa. Commonwealth Ct. 390, 559 A.2d 1010 (1989). As in public utilities, the insurance industry is subject to particularly strict regulation by state government because the impact of an insolvent insurer's contracts is not limited to the named parties. *See Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983). This is particularly applicable to the contracts for reinsurance without which Mutual Fire would have been unable to expand its business. Rather, those contracts

entered into by Mutual Fire have affected thousands of members of the public. Of course, individual parties to those contracts cannot be expected to protect this public interest. Thus, the General Assembly, pursuant to its inherent police power to safeguard the public interest, has authorized the Commissioner to represent these interests in order to minimize the harm to all affected parties—insureds, creditors and the public generally—from the potentially devastating consequences of insurance insolvency. 40 P.S. § 221.1. If the Commissioner determines that rehabilitation, as opposed to liquidation, is the most efficient means of representing these interests, and this Court finds no abuse of her discretion, then contractual impairments that are insubstantial and reasonably necessary to implement a rehabilitation plan cannot be deemed unlawful. *Energy Reserves Group.* "[A]n impairment may be constitutional if it is reasonable and necessary to serve an important public purpose." *U.S. Trust Co. of New York v. New Jersey,* 431 U.S. 1, 25, 97 S.Ct. 1505, 1519, 52 L.Ed.2d 92 (1977). We are convinced that Mutual Fire's rehabilitation serves an important public purpose. Hence, we examine the "extent of impairment[s]" to determine their reasonableness. *Id.* at 27, 97 S.Ct. at 1520.

Except for the Plan modifications outlined in this opinion, the Court finds that the alleged contractual impairments are insubstantial and reasonably designed to enable the Commissioner to satisfy *all* claims in an equitable and orderly manner.

## SETOFF

The Plan as now proposed contains, in effect, three definitions of offset. The first provides that mutual debt and credits are only those Due and Owing [11] on December 31, 1986. The optional definition, which may be elected by

---

11. The term "Due and Owing" is in turn defined as reinsurance recoverable on *paid* losses, *paid* loss adjustment expenses, claim settlement and reimbursement agreements. Section I.II of the Plan (emphasis added).

reinsurers who are also cedents by paying the amount due and owing Mutual Fire within ninety days of plan approval, is the lesser of Mutual Fire's obligation to a cedent for Due and Owing, plus reported case reserves, plus Incurred But Not Reported ("IBNR") losses as of March 31, 1986, *or* the cedent's obligation to Mutual Fire for balances due and owing, plus case reserves as of December 31, 1986. Lastly, insurers paying Due and Owing within ninety days of Plan approval will receive a 10% discount if they waive any and all rights to setoff.

We will examine the optional setoff definition contained in Section III.E.2, the definition most generous to Mutual Fire's creditors according to the record, Rehabilitator's Exhibit No. 4, 7/25/89, on the assumption that those creditors using the more restrictive definition have consented to do so.

■ We first note that Article V's rehabilitation section contains no definition of setoff while the liquidation provision does. We have already stated that this evidences an intent that rehabilitation proceedings are distinct from liquidation proceedings. *Muir.* If the Rehabilitator's formulation of a plan is not arbitrary or unreasonable, then that plan should be approved if it does not diminish the rights a creditor would have in liquidation.

The Plan's treatment of rights of setoff, found not only in specific contracts but also in common law, must be modified as follows.

■ Section III.E.2.a, pertaining to setoff by reinsurers who are also cedents, shall read so as to compute balances as of December 4, 1986, the date on which the Commissioner filed the petition for rehabilitation. Had the Commissioner petitioned for liquidation rather than rehabilitation on that date, these objectors' rights would be fixed as of that filing date. Section 520(d) of the Act, 40 P.S. § 221.20(d). Thus, this Plan modification assures that those objectors receive substantially the same setoff rights and treatments they would receive in a liquidation.

■ Section III.F., placing a $25,000,000 cap on total allowable setoff is stricken. There is no provision for a maximum setoff allowance in liquidation proceedings and no legal justification for this restriction.

■ Further, the Plan's provisions, proclaiming Mutual Fire's books and records to be conclusive, are stricken. Due to the established inaccuracy of Mutual Fire's records, this condition substantially impairs the objectors' right to an accurate accounting. Therefore, the Plan is modified to provide that the figures in Mutual Fire's books may be contested through the Plan's claims and disputes resolution procedures.

## PRIORITY OF DISTRIBUTION

### A. *Cut-off Date for Submission of Class 4 Loss Claims*

■ The Policyholders Committee and (not surprisingly) individual policyholders whose businesses expose them to a "long tail" of liability, object to June 30, 1991, as the cut-off date for recognition of loss claims. The Plan as proposed provides that all such claims reported thereafter will be included in Class 8 ("late claims") priority.

We find, however, no abuse of discretion in fixing this date. Given that Mutual Fire has not written business since mid-1986, a cut-off date set five years out from the cessation of business cannot be considered arbitrary or unreasonable. Moreover, the Rehabilitator has it within her authority to seek modification of that date if she deems it inappropriate. A determination can be better made by examining loss development experience as the 1991 date approaches. Therefore, we approve the June 30, 1991 date for the submission of loss claims as contained in Section II.H and VI.G of the Plan. This Court may, however, in the future direct the Rehabilitator to submit a recommendation as to whether the date should be extended.

## B. *Lenders as Policyholders*

■ Six of the ninety-one banks and financial institutions which participated in the Mutual Fire surety bond program have jointly objected to their placement in Class 5 of the Plan's distribution schedule. Known informally as "the Lender Group," these lenders have put forth their view that the surety bonds are insurance policies, entitling them to treatment under the Plan as Class 4 policyholder recipients.

This theory has engendered much controversy in these proceedings, and its proponents as well as opponents have referred us to a wealth of authority for their respective positions. Despite this, our research has revealed no Commonwealth precedent which holds squarely that a surety bond is (or is not) an insurance policy. Thus, we view this as an issue of first impression. For the reasons which follow, we conclude that participants in Mutual Fire's surety bond program are not entitled to the same treatment as Class 4 claimants.

First, we acknowledge the fundamental differences pointed out to this Court between bilateral contracts of insurance and tripartite surety bond agreements. Unlike insurance policies, surety bond premiums are not determined by the insurer on the basis of loss but rather on the *lender's* evaluation of risk. Premiums are paid *not by the lenders* but by the investors; they are paid "up-front" and are not subject to adjustment. The instruments have no fixed terms and no right of cancellation or renewal. These factors support the conclusion that the surety bonds are in the nature of commercial guarantee instruments rather than policies of insurance.

Second, we do not find it dispositive that the issuance of these bonds is regulated by the Insurance Department. *Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979); *see also* Backman, *Surety Rate–Making* (1948). If, as the lenders argue, the best evidence of the lenders' policyholder status is provided by the bond instrument itself, then there is ample argument in the instrument's title, "Financial Surety

Bond for Limited Partnerships," to counter the notion that the use of the term "policy" in the documents render them insurance contracts. Regardless, we must look beyond these contradictory references and any other nomenclature contained therein to examine the essence of these transactions. We adopt, as has the United States Supreme Court, "the usual view, grounded in commercial practice, that suretyship is not insurance." *Pearlman v. Reliance Insurance Co.,* 371 U.S. 132, 140 n. 19, 83 S.Ct. 232, 236 n. 19, 9 L.Ed.2d 190 (1962); *see also American Insurance Association v. Clarke,* 656 F.Supp. 404 (D.C.1987) (municipal bond "insurance" is a bank credit transaction functionally equivalent to a standby letter of credit).

Moreover, accepting for the moment that surety bond coverage might be regarded as insurance because it is regulated by the Commonwealth insurance laws, we find no abuse of discretion in subordinating the claims of the lenders, who have recourse against investors through their own collection efforts, to those of policyholders, who will recover only what they can from Mutual Fire's estate and guarantee funds.

We find that, even if these bonds were contracts of insurance, the legislature has excluded them from coverage under The Pennsylvania Insurance Guaranty Association Act, Act of November 25, 1970, P.L. 232, *as amended,* 40 P.S. §§ 1701.101—1701.605. This exclusion evidences an intent not to afford surety holders the protections given by this Act to consumers of insurance whose carrier becomes insolvent.

For these reasons, we conclude that participants in the surety bond lender program would not fall within the same claimant class as "direct book" policyholders were Mutual Fire in liquidation. Thus, their rights are not diminished by their placement in Class 5 of the Plan's distribution schedule. Accordingly, we approve Section II.E of the Plan.

C. *Creation of Class 6 and Class 6 Fund*

The Lender Group has objected to the creation of a segregated Class 6 fund to be funded by the deposit of 25%

of all reinsurance Mutual Fire collects. No portion of this fund shall be paid unless and until this Court enters an Order authorizing initial distribution, and until Class 4 loss claims are paid in full.

The Lender Group, who stands to receive distributions in Class 5 before general creditors in Class 6, argues that this set-aside is inequitable and renders them a sub-class of creditors junior to general unsecured creditors (i.e., principally cedents), in violation of the Act's liquidation provisions.

However, these Class 5 lenders, who fall immediately behind the Class 4 policyholders but before Class 6 creditors, stand to benefit by what we perceive is an equitable innovation in the Plan. Since under the Act the lenders are entitled to no higher distribution priority than general unsecured creditors, we find that the creation of Class 5 and the creation of a Class 6 segregated account are acts well within the Rehabilitator's discretion which do not violate the dictates of *Neblett.*

In sum, we find the creation of both Class 5 and Class 6 to be a proper exercise of the Rehabilitator's discretion. If, after all, insurance is to perform its function of risk assumption and distribution of loss, then those statutes which govern it must first protect the insuring public, particularly in situations where the insurer becomes incapable of covering the risks it contracted to assume. Rehabilitation and liquidation are of vital importance to the consumer, who relies in the first place on the industry itself and then on its regulators for protection. No one can dispute that that consumer is not possessed of equal bargaining power, knowledge, or resources as that of the reinsurance entities and financial institutions which comprise the other major creditor classes in this proceeding.

### D. *United States Claims*

 United States claims are treated under the Plan as Class 7 claims. The United States government objects to the Plan because it does not accord first priority of payment

of debts due the United States. It is asserted that this treatment violates 31 U.S.C. § 3713 (1983), known as the Federal Priority Act, which requires that a United States government claim "shall be paid first when ... a person indebted to the Government is insolvent...."

The Rehabilitator counters that the Federal Priority Act is inapplicable to these proceedings because the McCarran–Ferguson Insurance Regulation Act, 15 U.S.C. § 1012 (1976),[12] precludes the impairment or invalidation of state insurance law by any federal statute.

Upon consideration of this objection and the Rehabilitator and other policyholders' responses thereto, we direct the Rehabilitator to set aside an amount which she finds in her discretion to be appropriate to pay United States government claims. We further direct her to report to this Court the amount contained in this set-aside fund and will order the Plan to be so modified. We do this with the following considerations in mind.

First, the Rehabilitator avers or contends that the only federal claims Mutual Fire has identified are (1) Federal Savings and Loan Insurance Corporation (FSLIC) receivership claims; (2) Environmental Protection Agency claims, "contingent and undetermined" according to the proofs of claims filed, against *insureds* of Mutual Fire; and (3) claims made by Westinghouse Electric Corporation against whom the United States may have claims. The United States does not dispute this averment that only these subrogated and third-party claims have arisen so far. We do not agree that the existence of these claims renders Mutual Fire a "person indebted to the Government," within the meaning of the Federal Priority Act. That is not to say, however, a debt due the United States could not arise, or that no federal claim *will* be filed.

**12.** *15 U.S.C. § 1012(b) provides, in pertinent part:* "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance...."

Second, although we need not decide today whether the McCarran–Ferguson Act applies to preclude the application of the Federal Priority Act, we have already recognized that the Commonwealth's Insurance Company Law governing rehabilitations is, as was said in *SEC v. National Securities, Inc.*, 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), "aimed at protecting or regulating this relationship [between insurer and insureds] directly or indirectly." *Id.* at 460, 89 S.Ct. at 569. Thus, Article V would be deemed a law regulating the "business of insurance." *Id.*[13] If, after all, liquidation of insolvent insurance companies were *not* the business of insurance relegated to the states' governance by McCarran–Ferguson, the federal Bankruptcy Code would obviate the need for this statute and similar acts in other states. Hence, McCarran–Ferguson would appear to preclude the application of the Federal Priority Act.

### E. *Judgment Creditors*

 Pepsi–Cola Bottling Company of Charlotte, Incorporated, (Pepsi–Cola), has objected to the Plan on the ground that as a federal court judgment holder against Mutual Fire, it is entitled to elevated priority when distributions are made to Class 4 policyholders. Although we agree that this judgment is binding on and cannot be altered by the Rehabilitator, Pepsi–Cola points to no authority—and we have found none—for the position that it is entitled to payment before other policyholders.

Neither the rehabilitation nor liquidation provisions of Article V sets forth any priority for judgment creditors. On the contrary, the serving of a judgment does not elevate the status of such claims. *Davis v. Commonwealth Trust Co.*, 335 Pa. 387, 7 A.2d 3 (1939).

**13.** Notwithstanding the Ninth and Fourth Federal Circuit decisions to the contrary, we note the Third Circuit has stated that state-regulated insurance insolvencies are the business of insurance authorized by McCarran–Ferguson. *Lac D'Amiante Du Ouebec, Ltee v. American Home Assurance Co.*, 864 F.2d 1033 (3d Cir.1988), citing *United Services Auto. Association v. Muir*, 792 F.2d 356 (3d Cir.1986), *cert. denied*, 479 U.S. 1031, 107 S.Ct. 875, 93 L.Ed.2d 830 (1987).

Accordingly, we approve Section II of the Plan as modified, consistent with our determination that a set-aside be provided for United States government claims.

## LOSS ADJUSTMENT EXPENSES

No less than fifteen claimants have objected to the Plan's provision for the equal sharing of loss adjustment expenses by Mutual Fire and its policyholders as of April 1, 1989.

We are painfully aware of the magnitude of this—the largest current expense of the estate—and of the drain it causes on Mutual Fire's resources. Most, if not all, of the retainers and employment agreements were negotiated by Mutual Fire or its authorized agents prior to its suspension and rehabilitation. It stands to reason that those persons did not have the same incentive to economize which representatives of an insolvent estate necessarily possess. Everyone now, though, must recognize the changed circumstances which have led to this rehabilitation proceeding.

Notwithstanding these changed conditions, in order to minimize the possibility of prejudice to the policyholders whose claims Mutual Fire is obligated to defend, we will modify Section IX of the Plan and direct that loss adjustment expenses be shared equally as provided in the Plan, but not until ninety days from the date of the Order entered today. We extend the date for the reduction of full payment of loss adjustment expenses in order to minimize any adverse consequences on the defense of claims.

At the same time, we will further Order the Rehabilitator to review *all* employment and retainer agreements, including those of outside counsel and consultants employed with the Court's approval, with the aim toward renegotiation, where appropriate, and reduction of fees and expenses. It is obvious, though worth repeating, that each dollar expended in administrative and unreinsured loss adjustment costs and fees is a dollar taken away from the payment of claims. We therefore view this as a task of vital importance to the

insureds and claimants and require that it be undertaken forthwith.

## PROPORTIONAL PAYMENTS METHOD

The Rehabilitator proposes,[14] as part of the Plan's proportional payment methodology, to make the first distribution to pay "small claims"—those of $5,000 and under— "as soon as practicable following the effective date of this Plan." We view this innovation an effective and expeditious means of carrying out the Rehabilitator's statutory mandate and find it to be an "equitable apportionment of unavoidable loss." Consequently, we approve it but with the following modifications.

We will require the Rehabilitator to make payments under this distribution no later than June 1, 1990. We will also require the Rehabilitator to submit a schedule of payments made under this provision of the Plan and direct her to establish a schedule of distribution dates which she deems appropriate. Additionally, we will modify the Plan so that payment of these small claims to single persons or entities with more than one claim shall be taken into account in the proportional payment program. We agree with the Policyholders Committee that this latter modification will minimize the preference otherwise given to policyholders with multiple small claims.

The Policyholders Committee also urged us to allow small claims payment only to those claims *not adjusted* as of the Plan approval date. Underlying this argument is the rationale that immediate adjustment and payment of small claims will save the estate costs concomitant with the continuing management of the outstanding, unadjusted claims. While this rationale applies in part to the Rehabilitator's proposed methodology, we believe such a distinction is inequitable and punishes those claimants who have thus far cooperated with the estate by resolving disputes and settling claims during the pendency of these proceedings.

14. This proposal was also embodied in the Rehabilitator's motion for authority to pay small claims filed August 11, 1989.

We will, therefore, approve the payment of small claims whether adjusted or unadjusted as of this date.

## MISCELLANEOUS PROVISIONS

### A. *Jurisdictional Statement*

Article V defines the Commonwealth Court's jurisdiction. "No court of this Commonwealth shall have jurisdiction to entertain, hear or determine any delinquency proceeding other than as provided in this article." Section 504 of the Act, 40 P.S. § 221.4.

The statute contemplates that the Commissioner shall petition this Court for rehabilitation and thereafter be appointed statutory rehabilitator. 40 P.S. § 221.15. The Commissioner, as Rehabilitator under the Court's supervisory aegis, is empowered to "pursue all appropriate legal remedies on behalf of the insurer." 40 P.S. § 221.16(c).

In any court in this state before which any action is pending when a rehabilitation order is entered, the Rehabilitator may request a stay. 40 P.S. § 221.17(a). This Court then shall order the Rehabilitator to take such action in that "pending litigation as the court deems necessary...." In addition, the Rehabilitator is directed "to consider all litigation pending outside this Commonwealth and shall petition the courts having jurisdiction over that litigation for stays whenever necessary...." *Id.*

Thus, the plain language of the statute provides for the Commonwealth Court's exclusive jurisdiction over delinquency proceedings themselves, while recognizing that other courts have jurisdiction over pending proceedings by or against an estate in rehabilitation. Although the Rehabilitator refers us to decisions in other jurisdictions which found an *implied* grant of exclusive jurisdiction to the receivership court,[15] we are not permitted to ignore the statute's plain language in a search for legislative intent.

---

15. *In the Matter of Allcity Insurance Co.,* 66 A.D.2d 531, 413 N.Y.S.2d 929 (1979), and *United States v. Bank of New York & Trust Co.,* 296 U.S. 463, 56 S.Ct. 343, 80 L.Ed. 331 (1936) (adopting New York Court's

We disagree with the Rehabilitator that the jurisdictional provision contained in the present Plan is nearly identical to that the Court approved on May 18, 1987. Sections VIII(c) and (e) differ in material respects and we will strike them in whole or in part. Sections (a), (b), (d), (f) and (g) comport with Article V's grant of exclusive jurisdiction in *delinquency* proceedings because they invoke our exclusive jurisdiction in this Commonwealth over matters connected to interpretation of the Plan—and implementation of the rehabilitation itself—including its provisions for asset collection and claims disputes. We therefore approve them.

Likewise, we approve Section X.A, governing disputes other than claims subject to arbitration. We construe this section as permitting parties to a dispute to *request* Commonwealth Court resolution in lieu of arbitration.

### B. *Committee Dissolution*

 The Rehabilitator has in the Plan proposed that the Policyholders Committee appointed January 28, 1987, by the Court be dissolved.[16] This Court, by Order of November 22, 1989, so dissolved the Committee.

Notwithstanding the Committee's argument that policyholders as a class would thereby be without representation, we took this action for the following reasons.

Primarily, the rehabilitation statute conveys to the Rehabilitator the authority and the *duty* to protect the interests of Mutual Fire's insureds. 40 P.S. § 221.1(c). The Rehabilitator has taken possession of Mutual Fire's assets and, by her deputies, continues to administer its business and property, "under the orders of the Court." 40 P.S. § 221.15(c). In instances where she deemed it necessary she has pursued (and will pursue) litigation on behalf of Mutual Fire. She has now proposed a Plan which upon examination and

construction of state law in *People by Beha v. Russian Reinsurance Co.,* 255 N.Y. 415, 175 N.E. 114 (1931)).

**16.** The Rehabilitator by motion of April 6, 1989, had previously asked this Court to suspend payment of the Policyholders Committee's counsel fees and costs. Because of our determination of this Plan provision, we will now dismiss this motion as supererogatory.

as modified, we find gives due consideration to Mutual Fire's policyholders and other creditors as well.

In addition, the Rehabilitator has petitioned for the establishment of a program to pay outstanding claims under $5,000; a provision for "hardship" claims; and a proportional payment methodology. These procedures, as now modified in the Plan, will protect those policyholders (and claimants) with little or no recourse except to Mutual Fire insurance. Thus, the most damaging exposure to small, "mom and pop" policyholders has been minimized. As the Policyholders Committee has repeatedly stated in its numerous motions and briefs, the rationale underlying its existence and functions is to protect the policyholder class.

Thus, we conclude that the need this Court perceived when equitable considerations dictated the Policyholders Committee's formation no longer exists. Consequently, we find that this cost to Mutual Fire's diminished estate can no longer be justified.

Moreover, dissolution of the Committee does not leave policyholders unrepresented. As we have stated, the Rehabilitator is statutorily charged with that duty. Moreover, dissolution of the Policyholders Committee means only that this Court will not authorize payments of its costs and fees from Mutual Fire's estate. The Policyholders Committee may, as it sees fit, continue its activities outside the Court's aegis, as have the other creditors' groups known as the "lender group" and "cedents' group." Of course, individual policyholders also continue to have an opportunity to be heard.

Accordingly, we approve Section XVI.I of the Plan.

### C. *Immunity Provision*

 Because no provision for immunity contained in the Plan can *in any case* confer upon the Rehabilitator, her deputies or agents immunity greater than that given by Pennsylvania law as codified in Sections 8501–8528 and 8541–8564 of the Judicial Code, 42 Pa.C.S. §§ 8501–8528;

8541–8564, we will strike this section of the Plan as supere-rogatory. We emphasize that we do not by this action decide the question of the Rehabilitator's immunity.

## D. *Indemnification Agreement*

The Policyholders Committee has also, by separate mo-tion,[17] sought disapproval of certain employment agree-ments which the Rehabilitator has entered into in connec-tion with her powers under 40 P.S. § 221.16(a) and (b). The Policyholders Committee would have us disapprove the em-ployment of more than one deputy and strike those parts of any agreements containing indemnification provisions for appointed deputies and other employees.

However, the above-mentioned section of Article V gives the Rehabilitator express power to "appoint a special deputy who shall have all the powers of the rehabilitator" and who shall "serve at the pleasure of the commissioner." In addition, the Rehabilitator "shall have full power to direct and manage, to hire and discharge employes...." We do not find it unreasonable or arbitrary that the Reha-bilitator has chosen to appoint a deputy and an "assistant special deputy" to implement a rehabilitation and to manage an estate of this magnitude.

Next, the Policyholders Committee refers to au-thority which it argues would require us to find indemnifi-cation agreements between the Rehabilitator and her depu-ties void as against public policy. Relying on *Hodgson's Estate*, 342 Pa. 250, 20 A.2d 294 (1941), and *Dilks v. Flohr Chevrolet*, 411 Pa. 425, 192 A.2d 682 (1963), the Policyhold-ers Committee maintains that the indemnity contract to which it objected cannot be entered into because its terms exempt one charged with public service from liability. We find the Committee's arguments unpersuasive in this reha-bilitation context, however.

First, *Hodgson's Estate* decided issues raised in testa-mentary trust litigation. While there is some analogy be-

17. Policyholders Committee Objection, March 9, 1989.

tween an executor or administrator and the Rehabilitator's deputies in this rehabilitation, it has been noted that a receiver's possession of assets is not precisely that of a trustee, but is merely a figurative way of stating that the receiver must hold the property for the benefit of others, albeit in a fiduciary capacity.[18]

We also note that *Miller v. Jacobs*, 361 Pa. 492, 65 A.2d 362 (1949), another testamentary estate decision on which the Policyholders Committee relies, stated the general rule that estate administrators are liable individually but "[w]hether the executor or administrator may have *indemnity* out of the estate is of no concern to third persons." *Id.*, 361 Pa. at 495 n. 1, 65 A.2d at 364 n. 1 (emphasis added).

Nor does *Dilks* stand for the proposition that *exculpatory* clauses, which may be voided as against policy, *Boyd v. Smith*, 372 Pa. 306, 94 A.2d 44 (1953), and *indemnity* provisions receive the same treatment under Pennsylvania law. Rather, we find persuasive the Third Circuit's reasoning in *Jamison v. Ellwood Consolidated Water Co.*, 420 F.2d 787, 789 (3d Cir.1970):

> The difference between ... [exculpatory clauses and indemnity agreements] is manifest and significant. A valid exculpatory clause precludes recovery by the victim of the negligence. In contrast, a valid indemnity provision in no way affects the victim's right of recovery..... The Dilks opinion shows an awareness that indemnity and exculpatory clauses are sufficiently similar that the same rules of construction may often be used. However, Dilks clearly did not go so far as to say that the public policy considerations determinative of the legality of exculpatory clauses are necessarily determinative of the legality of indemnity clauses.

On the contrary, the Rehabilitator's action in agreeing to indemnity is reasonably related to public policy considerations governing insurance company rehabilitation.

**18.** Couch on Insurance 2d (Rev. ed. 1984) § 22:45.

The necessity of finding experienced and competent deputies is recognized by the statute. "The commissioner shall make such arrangements for compensation as are necessary to obtain a special deputy of proven ability." 40 P.S. § 221.16(a).

In order to attract persons of proven ability, that necessity dictates that those persons be somehow insulated from the fears and costs of possible litigation by naturally disgruntled claimants and other creditors who will inevitably suffer some loss. To this end, the Rehabilitator has adopted a reasonable policy of indemnifying her deputies for all actions within the scope of their appointed duties. We therefore by Order of March 17, 1989, approved the Rehabilitator's request for this employment agreement.

## CONCLUSION

Having considered all objections and found that the proposed Plan, with modifications, constitutes an equitable apportionment of unavoidable loss, is in the best interests of insureds and other creditors, and does not constitute an abuse of the Rehabilitator's discretion, we modify the Plan consistent with this opinion and approve it in all other respects.

## ORDER

The Rehabilitator's January 31, 1989 Plan of Rehabilitation in the above-captioned matter is modified as follows:

1. The Rehabilitator shall set aside funds which she deems adequate to satisfy any and all possible debts due to the United States Government from The Mutual Fire, Marine and Inland Insurance Company's (Mutual Fire) estate. The Rehabilitator shall advise the Court when this amount is determined and describe the nature of the potential claims for which funds have been set aside. The Rehabilitator shall also notify the United States Government of its determination.

2. Section II.J. is amended to read:

J. Class 10: Owners, Officers and Directors

To the extent of cash available after full payment of all Class 9 claims, payments shall be made to Policyholders as of December 4, 1986, other than in their capacity as Class 4 claimants, in proportion to the annual premiums for the policies then in force.

3. Section III.D., first paragraph, is amended to read:

Setoff for purposes of this Plan shall be calculated as of December 4, 1986. No setoff shall be allowed or paid in those situations described in 40 P.S. § 221.32(b)(1) through (4). Within ninety (90) days of final approval of the Plan, the Department shall notify each creditor of the amount of setoff as calculated by the Rehabilitator. This notice shall contain a statement advising each creditor that it shall have thirty (30) days from receipt of said notice to object to the Rehabilitator's calculation, or that calculation shall be deemed final. In the event of an objection, the dispute shall be resolved pursuant to the Claim Resolution Procedures set forth in Section VII of this Plan.

4. Section III.E.2. is amended to read:

a. Mutual Fire's obligation to the Cedent for: balances Due and Owing, plus reported Case Reserves, plus reported IBNR.

All as computed as of December 4, 1986; or

b. The Cedent's obligation to Mutual Fire for: balances Due and Owing, plus Case Reserves.

All as computed as of December 4, 1986.

Mutual Fire's IBNR is specifically excluded from section (b.) of this calculation.

To the extent that Case Reserves are set off and the claims relating to those case reserves ultimately are settled at a value less than the reserved amount, Reinsurer who is also a Cedent shall remit, in cash, the balance to Mutual Fire.

5. Section III.F. of the Plan is stricken in its entirety.

6. Section VI.A. is amended to read:

Interim Partial Payments

Interim Partial Payments shall be made periodically on Class 4 adjusted claims (Policyholder Loss Claims and Guaranty Association Loss Claims) as cash is available, in the manner set forth below.

1. The first distribution to Class 4 shall be made as soon as practicable following the effective date of this Plan, but no later than December 1, 1990. The Rehabilitator shall pay after the effective date Class 4 claims of $5,000.00 or less per adjusted claim as and when adjusted out with the first payment not later than June 1, 1990.

2. Unless otherwise Ordered by the Court, distributions shall thereafter be made to Class 4 adjusted claims at least annually.

3. Payments of Class 4 claims to Class 4 claimants with more than one claim under $5,000.00 shall be treated as advances against distributions under the Proportional Payments Method described herein. No Class 4 claimants who receive payment for multiple small claims shall receive distribution under the Proportional Payment Method until all the Class 4 claimants first receive an equal percentage distribution on their adjusted claims.

7. Section VI.C.1.b. is amended to read:

b. The first distribution respecting claims adjusted between Record Dates ("later-Adjusted Claims") shall cause each such Claim to receive an amount equal to the cumulative percentage paid on earlier Adjusted Claims so that all Adjusted Claims as of a given Record Date shall receive, on a cumulative basis, proportionally equal distributions as of each Distribution Date.

8. Section VI.C.4. is amended to read:

Upon notice as the Court shall require, all assets held and segregated pursuant to this Section VI by the Rehabilitator, after Class 4 Claims are paid in full or reserved for payment in full, shall be released for payment to Classes 5 through 10.

9. Section VII, second paragraph, is amended to read:

Whenever objections are filed and served, the Rehabilitator shall seek a hearing and give notice of the hearing by first class mail to the Claimant or its attorney not less than thirty (30) days before the date of the hearing. The matter may be heard by the Court or by a court-appointed referee or master who shall submit findings of fact along with his recommendation. Claimants shall cooperate with the Rehabilitator in an effort to settle and adjust Claims.

10. Section VIII.(c) is modified to read:

(c) to hear, determine and where appropriate refer to arbitration, all disputes concerning Claims and the collection of assets of Mutual Fire, including reinsurance and retrocessions;

11. Section VIII(e) is stricken.

11(A). The second paragraph of Section IX Loss Adjustment Expenses is amended to read:

Loss Adjustment Expenses related to the employment of all investigators, adjustors and counsel who are retained by the Rehabilitator or Mutual Fire or either of their authorized agents to investigate, adjust and defend Claims asserted against Mutual Fire's Policyholders ("Professionals") shall be shared equally by Mutual Fire and its Policyholders effective April 23, 1990. The Rehabilitator reserves the right to further reduce or terminate payment of Loss Adjustment Expenses in the event that cash flow is inadequate. Loss Adjustment Expenses will be paid as aforesaid by Mutual Fire only if Policyholders pay their share of Loss Adjustment Expenses and retain the services of Professionals previously approved or hereafter approved by the Rehabilitator.

12. Section XIII.B. is amended to read:

No action at law or equity shall be brought against Mutual Fire or the Rehabilitator or any employee, agent or representative of the Rehabilitator, whether in the Commonwealth of Pennsylvania or elsewhere, nor shall any such existing actions be maintained or further prosecuted, nor shall any counterclaim or setoff be asserted in

any action brought by or on behalf of the Rehabilitator, whether in Pennsylvania or elsewhere, except as permitted under the terms of this Plan or by the Courts.

The last sentence of Section XIII.B. is stricken.

13. Section XVI.B. is amended to read:

B. Financial Reports

The Rehabilitator shall submit to the Court an annual budget for each year. The Rehabilitator shall also file quarterly financial reports with the Court showing Mutual Fire's current financial condition, a balance sheet, an income statement, a cash flow statement, a statement of operating and administrative expenses. The Rehabilitator shall also file status reports on reinsurance and asset collections, claims reported and adjusted, and such supporting schedules as are necessary to present Mutual Fire's financial condition fairly.

14. The Plan, including each provision except where amended by this Order, is approved in all other respects.