George F. GRODE, Insurance Commissioner of the Commonwealth of Pennsylvania, Plaintiff,

v.

The MUTUAL FIRE, MARINE & INLAND INSURANCE COMPANY, Defendant.

Commonwealth Court of Pennsylvania.

Dec. 26, 1996.

Publication Ordered Jan. 28, 1997.

Robert H. Levin, Philadelphia, Frank H. Getter, Harrisburg and Richard DiSalle, Pittsburgh, for plaintiff.

Andrew Entwistle, New York City, Robert J. Hoelscher, Philadelphia, Robert J. Lynott, Baltimore, MD and Richard DiSalle, Pittsburgh, for defendant.

---

## MEMORANDUM AND ORDER

LORD, Senior Judge.

We have before us a petition to terminate the rehabilitation of The Mutual Fire, Marine and Inland Insurance Company (Mutual Fire) and a request for discharge.

Ten years ago, on December 8, 1986, this Court granted the petition of George F. Grode, then Commonwealth Insurance Commissioner, to rehabilitate Mutual Fire. In his petition, Commissioner Grode sought, with the consent of Mutual Fire's then officers and directors, *inter alia*, his appointment as statutory rehabilitator of Mutual Fire, as well as the authority to take possession of its assets in order to manage and administer them under orders of this Court. Section 515(a), Article V of the Act of May 17, 1921, P.S. 789 *as amended*, 40 P.S. §§ 221.1—221.63 (Act). Commissioner Grode submitted a proposed plan for the rehabilitation of Mutual Fire when he filed his petition.

President Judge James Crumlish, Jr. thereupon directed the rehabilitator to provide meaningful notice to all policyholders, creditors and others on whom it was determined the rehabilitation would have a substantial effect. The Court also appointed a policyholders committee. Numerous objections to the proposed rehabilitation plan were lodged and a hearing date on the plan and objections thereto was fixed for June 3, 1987. The proposed plan, with alterations, was thereafter approved on June 26, 1987, and the statutory rehabilitator, by now Insurance Commissioner Constance Foster, was directed to report to the Court on the progress of the rehabilitation and the feasibility of implementing the plan. After an interim report and a requested extension of time, the statutory rehabilitator filed her report on May 2, 1988. It was decided at that time that any rehabilitation of an estate of this magnitude would require the appointment of a deputy rehabilitator on site every day as well as the retention of legal counsel and other staff to accomplish the paramount goal of collecting those recoverables comprising a significant portion of the estate's assets.

The statutory rehabilitator's report on the 1987 plan indicated that the plan was not feasible, and the Court, after consultation with the rehabilitator, directed her to submit an amended plan. In the interim, notices of balance due were sent to all reinsurers of Mutual Fire. An amended plan was formulated and filed on January 31, 1989. Again, numerous objections were filed. The Court held hearings on the amended 1989 plan and those provisions of it to which objections were made. On consideration of those objections, upholding some and rejecting others, the Court modified the 1989 amended plan and approved it as modified. The Court directed the statutory rehabilitator to begin implementation of the plan immediately.[1]

Under that plan, the statutory rehabilitator was to implement a proportional payment method for policyholder claims. The proportional payment plan called for the rehabilitator to issue, from cash available to the estate, interim partial payment of Class 4 policyholder claims as those claims become adjusted. Cash available was to be allocated to adjusted claims, case reserves for unadjusted claims, IBNR (incurred but not reported) loss estimates and an estimation margin. The total amount of Class 4 adjusted claims and actuarial estimates of case reserve and IBNR was to be determined as of a certain record date (but at least yearly).

Under the proportional payment method, the statutory rehabilitator was to determine, in her expertise and discretion, and on Court review, the percentage to be paid on each adjusted claim, given Mutual Fire's cash available. The percentage would increase cumulatively each year by the record date. For example, if sufficient cash was available, claimants would receive fifteen percent payment of their claims. If collections were such that, at the next record date, a thirty percent payment could be made, claimants whose claims were newly adjusted received

1.  For more detailed discussions of Mutual Fire's insolvency, of the plan and of the numerous objections to it, see this Court's opinion, *Grode v. the Mutual Fire, Marine and Inland Insurance Company*, 132 Pa.Cmwlth. 196, 572 A.2d 798 (1990) and our Supreme Court's opinion in *Foster v. Mutual Fire, Marine and Inland Insurance Co.*, 531 Pa. 598, 614 A.2d 1086 (1992), *cert. denied*, 506 U.S. 1080, 113 S.Ct. 1047, 1051, 122 L.Ed.2d 356 (1993).

thirty percent payment, while those receiving fifteen percent on the previous record date received an additional fifteen percent payment to equalize payment on claims, and the process was to continue, if possible, until one hundred percent payment on all adjusted claims was effected. This methodology obviated the need to wait until every last estate asset was collected in order to ensure equitable distribution of those assets. It meant immediate, albeit partial, payment on policyholder claims. In addition, as part of this program, immediate one hundred percent payment of claims of $5,000 or less was approved by the Court. This "small claims" payment saved the estate the administrative costs of keeping open files of this size. A special provision was enacted for full payment of claims on a hardship basis, when certain financial or other criteria were met.

The rehabilitation plan also established a Class 6 Fund, for the general unsecured creditor class of claims, which class was comprised primarily of insurance entities who had ceded portions of their business to Mutual Fire to reinsure. Twenty-five percent of all reinsurance recoverables Mutual Fire collected was to be placed in a segregated account to be used for payment to Class 6 creditors only after all claims of a higher priority had been paid.

Although appeals were taken from this Court's order modifying and approving the 1989 plan, requests for stays pending appeals were denied and payment of 516 "small" claims—those under $5,000—was made on April 5, 1990. Thereafter, in December 1990, the first distribution under the proportional payment methodology, representing payment of twenty percent of all adjusted claims, was made. Mutual Fire distributed $17.2 million on 1,035 claims. The Class 6 fund was also established at that time. In early 1991,

President Judge Crumlish established, pursuant to Section 508 of the Act, 40 P.S. § 221.8, financial and claims reporting procedures, requiring the rehabilitator to file quarterly reports that included, *inter alia,* an income statement, statutory surplus and reserve analyses, schedules of actual-to-budget expenditures, monthly cash flows, and asset collection and claims caseload summaries.[2] In December 1991, another twenty percent payment was made in the amount of $26 million on adjusted claims over $5,000, bringing the payout on claims to forty cents on the dollar.

In August 1992, the Pennsylvania Supreme Court, on consideration of the appeals taken, and with a single modification affecting pre-rehabilitation judgment creditors, affirmed this Court's order upholding the rehabilitation plan. Writs of certiorari of the Court's order were thereafter denied by the United States Supreme Court on January 19, 1993. A seventy percent payment was made in December 1993, and a one hundred percent payment of all known, adjusted claims was made the following year, with a one hundred percent reserve established for all the remaining unsettled, unadjusted claims. The Court then directed the rehabilitator to pay outstanding claims as they became adjusted.[3]

Assets henceforth collected would now be available to distribute to the Class 5 surety bond program participants and to the Class 6, general unsecured creditor claimants, as well as to claims made after the Class 4 bar date (Class 8 claims). In 1995, a bar date for claims of general unsecured creditors was established and proofs of claims from those claimants were submitted to Mutual Fire. On July 16, 1996, having found that Mutual Fire's estate contained assets sufficient to do so, we granted the rehabilitator's motion to establish segregated reserve accounts for the

2. Judge Crumlish's decision on reporting requirements was affirmed by our Supreme Court, which held that "the Act and Plan are the source for financial reporting obligations in insurance rehabilitation proceedings. The Act requires '[t]he Commissioner as receiver [to] make such reports to the court at such time and in such manner as the court shall require.'.... Thus, the Rehabilitator must report to the Commonwealth Court as that court requires." *Foster v. The Mutual Fire Marine and Inland Insurance*

*Company,* 544 Pa. 387, 676 A.2d 652, 657 (1996) (citation omitted).

3. Order of January 6, 1995. On January 30, 1995, the Honorable Linda Kaiser became the Commonwealth Insurance Commissioner and therefore the statutory rehabilitator of Mutual Fire. Section 515(c) of the Act, 40 P.S. § 221.15(c).

outstanding Class 4 and 5 claims, to submit periodic reports on the progress of those claims and to begin partial payments to Class 6 claimants. By August 1996, the rehabilitator had effected a one hundred percent payment to all Class 5 and Class 6 settled and Court-approved claims.

As of this day, what remains are claims by some ten Class 4 creditors, which have been referred to referees for fact-finding and dispute resolution; one Class 5 claim awaiting a referee's recommended decision, and remaining Class 8 claims, which have also been referred to referees. The rehabilitator's motion for discharge asks that we continue to exercise our jurisdiction over this relatively limited number of claims.

Since implementation of the 1989 rehabilitation plan, the rehabilitator has paid $4.8 million in policyholder and third-party claims of $5,000 and less; the rehabilitator has paid $160 million dollars in the claims greater than $5,000. Nearly 3,400 individual claims and bulk settlements representing approximately 4500 claims have been adjusted and paid. Fifty-six surety bond participant claims of over $14 million dollars have been or will be paid. $95.5 million in payment to Class 6 claimants has been now effected. Class 8 claims continue to be paid at one hundred percent as they are adjusted and approved by the Court.

Early on in the rehabilitation proceedings and pursuant to its supervisory powers, the Court directed the rehabilitator to submit settlement of all claims to the Court for review and approval. Settlements of less than $100,000 were submitted to the Court in lists and by amount and type of claim. Settlement of claims in excess of $100,000 were submitted individually to the Court on petition for approval. Notice of these submissions was given to all affected parties, who were thus provided an opportunity to challenge the settlements as unreasonable or unfair. Even in the absence of objections, the Court was at times confronted with the need for additional information in order to appraise the fairness of the settlements to the claimants or the estate. Though the process was time-consuming to the rehabilitator as well as to the Court, it ensured that policyholders and claimants received due consideration of their claims, an exceptionally important consideration in an insurance insolvency of this magnitude.

Pursuant to the plan, the rehabilitator issued notices of determination on all unadjusted claims, and when a claim was denied in whole or in part by the rehabilitator, notice was given to the claimant, who thereupon was given sixty days to object to that determination. In the case of claims disputes that were not resolved, the Court appointed six referees to submit findings of fact and to issue recommended decisions, which the Court reviewed after considering any exceptions. The Court-appointed referees have ably handled these more contentious claims and have reinforced the Court's initial confidence in their abilities. The bulk of claims were adjusted and paid, however, without resort to this process.[4]

A distribution of estate assets of this significance would obviously not have been possible without extraordinary efforts to collect estate recoverables. Since submission of the 1989 plan of rehabilitation, and particularly in the years 1990 through 1996, reinsurance collections (the bulk of estate assets, *see* Section 503 of Article V of the Act, 40 P.S. § 221.3) have amounted to over $258 million. These collections were accomplished through negotiation, voluntary and Court-supervised settlements and, where necessary, litigation to trial. As with claims settlements, and for the same reasons, all commutations and settlements were submitted to the Court for review after notice to policyholders and other interested parties.

This summary is obviously inadequate to describe the enormity of this undertaking and the complexity of the entire rehabilitation. There were disputes between the policyholders committee and the rehabilitator, the rehabilitator and claimants, and the rehabilitator and cedents who owed money and were owed money. The cooperation of all

---

**4.** This rehabilitation plan provision closely parallels Section 541 of the Act, 40 P.S. §§ 221.41, which governs claim disputes in liquidations.

involved, considering the amounts of money under consideration, has been outstanding. When settlements were obviously impossible, the Court promptly held hearings and rendered decisions. In this day and age, when the Courts and lawyers seem to be under constant criticism, this case is a tribute to the system and an example of what can be accomplished with industry, patience and constant attention to the problem presented.

On behalf of this Court, as author of this opinion, I consider this success a tribute to President Judge Crumlish, to the various Insurance Commissioners, to their counsel, to Special Deputy Rehabilitator Bratic and all of his staff and to law clerk John Gordon, who ably assisted President Judge Crumlish and me in the management of this case.

On consideration the rehabilitator's petition to terminate the rehabilitation, the objections thereto, the rehabilitator's status report responding to said objections, and having reviewed the financial and claims reports as of September 30, 1996 filed by the rehabilitator pursuant to this Court's orders of February 26, 1991 and July 16, 1996, we enter the following

### *ORDER*

AND NOW, this 26th day of December, 1996, upon consideration of the Rehabilitator's Petition to Terminate Rehabilitation and Request for Discharge ("Petition"), having reviewed the rehabilitator's status report on claims and financial reports as of the third quarter ending September 30, 1996, and it appearing that:

(a) The Mutual Fire, Marine and Inland Insurance Company ("Mutual Fire") has collected substantially all of the collectible obligations due to it, and has sufficient assets to pay or fully reserve all remaining unpaid claims established by the Plan of Rehabilitation and/or by an Order of this Court;

(b) The rehabilitation of Mutual Fire has been accomplished pursuant to the Plan of Rehabilitation approved by this Court and by the Pennsylvania Supreme Court and grounds for rehabilitation no longer exist, justifying an order terminating rehabilitation under Section 518(b) of the Insurance Department Act, *as amended,* 40 P.S. § 221.18(b);

(c) The Rehabilitator holds funds in excess of the amount required for the payment or reservation in full of all remaining unpaid claims established by the Plan and/or by an Order of this Court, which excess funds are sufficient to make an additional distribution to eligible cedents and to provide Mutual Fire with the capital and surplus necessary to resume operations as a viable mutual insurance company in the Commonwealth of Pennsylvania;

(d) The statutory rehabilitator and her special deputy have developed a plan of operations for Mutual fire, post-rehabilitation, which focuses upon the marketing of homeowner's insurance, as well as the underwriting and marketing of other forms of insurance;

(e) The Insurance Commissioner has appointed a board of directors to operate the company, appoint officers and conduct annual meetings in accordance with the company bylaws and applicable Pennsylvania law; and

(f) Full and proper notice of the Petition has been given to all interested parties;

It is hereby ORDERED that:

1. The Rehabilitator's Petition to Terminate Rehabilitation and Request for Discharge is granted;

2. The rehabilitation of Mutual Fire under this Court's Order of December 8, 1986, is terminated pursuant to 40 P.S. § 221.18(b) as of the date of this Order (hereinafter the "Termination Date");

3. The Insurance Department of the Commonwealth of Pennsylvania shall immediately restore possession of Mutual Fire's property and control of its business to the company;

4. Mutual Fire, as of the Termination Date, shall resume operations as a mutual insurance company in accordance with the laws of the Commonwealth of Pennsylvania;

5. Only those obligations of Mutual Fire which have been established by the Plan and/or by an Order of this Court shall survive the termination of rehabilitation

and discharge; provided, however, that Mutual Fire's post-termination obligation shall extend solely to the collection of all sums due it and the adjustment, settlement and payment of the aforesaid remaining claims as approved by this Court, when required. Class 4 and 5 claims shall be paid solely from the funds established for those Classes as of the Termination Date; and Class 6 and 8 claims shall be paid solely from the assets encumbered for Class 6 and Class 8 as of the Termination Date. Payment of the aforesaid Class 4, 5, 6 and 8 claims shall not be made from any other source, and $27,999,809 shall represent the maximum liability of Mutual Fire for all outstanding and unsettled Class 8 claims;

6. After the Termination Date, this Court shall retain jurisdiction over Mutual Fire for the purpose of hearing and determining objections to unsettled, disputed or otherwise unresolved claims, including jurisdiction over all rehabilitation-related litigation, petitions, motions and other actions which remain pending before this Court as of the date of this Order;

7. The additional distribution to eligible Class 6 Cedents, as proposed by the Rehabilitator in the Petition, is hereby approved, and the Rehabilitator is directed to distribute approximately $30,000,000 to eligible cedents, as defined in the Rehabilitator's Petition, with the initial distribution to commence within 30 days of receipt of the proceeds from the settlement of litigation filed in this Court at No. 3483 C.D. 1986–A or entry of a final, unappealable order of this Court approving this Petition, whichever last occurs. The additional distribution to Class 6 eligible cedents shall be paid solely from this settlement recovery and shall not be deemed a liability of Mutual Fire, either pre- or post-termination.

8. Without limiting the generality or effect of paragraph 11 of this Order, the following provisions of the Plan of Rehabilitation shall survive termination of the rehabilitation and shall remain binding upon former policyholders and the current and former creditors of Mutual Fire post-termination:

- Section III (Setoff)
- Section VI.G. (Claim Bar Dates)
- Section XIII (Stay/Injunction)
- Section XVIII (Discharge)

9. Without limiting the generality or effect of paragraph 11 of this Order, the following Orders of this Court shall survive discharge and shall remain binding upon former policyholders and current and former creditors of Mutual Fire post-termination:

- Order of February 17, 1994 (Class 8, 9 and 10 bar date).
- Order of May 9, 1995 (barring claims against former directors and officers).
- Order of December 15, 1995, as modified herein (cedent bar/record date).
- Order of July 16, 1996 (Class 4 and 5 funds).
- Order of August 26, 1996 (cedent eligibility ruling).

10. Mutual Fire shall provide indemnity to Mutual Fire's former directors and officers, their heirs, successors and assigns, in accordance with Mutual Fire's existing Bylaws providing for the same, and the applicable provisions of the Pennsylvania Business Corporation Law. This obligation shall continue post-termination and shall survive the discharge;

11. Mutual Fire is hereby fully and unconditionally discharged and released from any and all claims, except for administrative claims and those remaining obligations to Classes 4, 5, 6 and 8 imposed upon Mutual Fire by the Plan and/or Order of this Court;

12. Linda S. Kaiser, Insurance Commissioner of the Commonwealth of Pennsylvania, is hereby discharged as Statutory Rehabilitator of Mutual Fire, and her predecessors and successors, deputies, special deputies, assistant special deputies, agents, representatives and employees are also discharged.