OPINION OF THE COURT
Richard M. Platkin, J.
More than a decade ago, on October 10, 2001, Supreme Court, New York County (Lehner, J.) granted the application of the Superintendent of Financial Services (the Superintendent)[1] to be appointed as rehabilitator (Rehabilitator) of Frontier Insurance Company (Frontier) pursuant to article 74 of the Insurance Law.
In a decision and order dated July 15, 2010, this court determined that it was necessary to:
“(1) examine the progress that the Rehabilitator has made in removing ‘the causes and conditions’ that have made this rehabilitation proceeding necessary (see Insurance Law § 7403 [a]); (2) require the Rehabilitator to develop and submit to the Court for its approval a plan of rehabilitation for restoring Frontier to solvency, including an assessment of how *531 long continued rehabilitation efforts are expected to take; and (3) give Interested Parties an opportunity to be heard regarding the [efficacy of the] Rehabilitator’s prior efforts and [to comment on] his future plans” (28 Misc 3d 1211[A], 2010 NY Slip Op 51275[U], *4 [2010]).
The decision and order explained that these measures would assist the court in “discharging its responsibility to oversee this statutory receivership, ensure openness and transparency, allow Interested Parties a meaningful opportunity to be heard, promote public confidence in the rehabilitation process, and allow for development of a factual record that may be useful in guiding this proceeding in the future” (id.).
By order to show cause dated January 13, 2012,[2] the Rehabilitator proposed a plan of continued rehabilitation for Frontier (Plan of Rehabilitation or the Plan). The Plan proposes an ongoing runoff of Frontier’s liabilities, with additional protection for “Claims under Policies,” as such term is defined in the Plan. The Plan does not establish a detailed timetable for restoring Frontier to solvency, but includes annual milestones over the next five years for reducing the amount of the insolvency. The Rehabilitator contends that these efforts are warranted to ascertain whether Frontier’s liabilities for “Claims under Policies” and then its other liabilities can be satisfied. The Rehabilitator further submits that continued rehabilitation efforts are preferable to immediate liquidation for at least three reasons: (1) the existence of an experienced staff at Frontier with significant institutional knowledge; (2) the ability in rehabilitation to effectively and efficiently coordinate the payment of liabilities and the collection of reinsurance proceeds; and (3) the delays in payment of claims attendant to the liquidation process.
Of particular significance to this application is the Plan’s definition of “Claims under Policies.” The Plan defines this term as “claims under policies of insurance . . . for losses incurred, third party claims, claims for unearned premiums, and all claims of a security fund, guaranty association or the equivalent except claims arising under reinsurance contracts” (Plan 1.2 [c]). This *532 definition was intended to exclude claims under surety bonds, fidelity bonds, contract bonds, performance bonds, indemnity bonds and similar instruments.[3] In addition to writing various lines of property and casualty insurance, Frontier had a significant book of surety business when it entered rehabilitation.
The Plan estimates Frontier’s liabilities for “Claims under Policies” at $93.2 million as of September 30, 2011.[4] The Rehabilitator proposes to continue to pay these claims in full, but recognizes that “Frontier’s $69.9 million in admitted assets and the earnings thereon, when matched with administrative expenses . . . , may not prove sufficient.” However, the Rehabilitator contends that it is premature at this time to reach a final conclusion as to whether all “Claims under Policies” can be paid in full.
The Plan further estimates Frontier’s liabilities for surety claims at $24.5 million. This estimate, a substantial discount from a book value in excess of $100 million, reflects the Rehabilitator’s belief that he can achieve highly discounted settlements of surety claims. This expectation, in turn, derives from the Rehabilitator’s position that claims under surety contracts are entitled to lesser priority in liquidation than claims under Frontier’s other insurance contracts. Accordingly, while the Rehabilitator proposes to attempt to negotiate the resolution of surety claims and other liabilities that are not “Claims under Policies,” he does not intend to pay such claims without prior court approval, and the Plan does not contemplate that these claims can be paid at their full book value.
In response to the order to show cause, the court received objections and/or comments from interested parties. The issues raised by these submissions fall largely into five general groupings. First, several interested parties question whether a plan for the long-term runoff of Frontier’s liabilities and marshaling of assets represents a “rehabilitation” of Frontier within the meaning of article 74. Second, a number of interested parties assert that the Plan does not comply with Neblett v Carpenter (305 US 297 [1938]), which requires a plan of rehabilitation to provide claimants with no less favorable treatment than they would receive in liquidation. Third, the same objectors argue *533 that the Plan’s treatment of surety claims is inconsistent with Insurance Law § 7434 (a) (1), which establishes a hierarchy of priority classes, requires claimants within a particular class to be paid in full before claimants in a lower priority class receive anything, and prohibits the creation of subclasses. Fourth, questions and concerns were raised regarding many of the factual premises and assumptions underlying the Plan and whether continued rehabilitation would actually benefit Frontier’s claimants and other creditors. Finally, certain objectors maintain that access to additional information concerning Frontier and the rehabilitation is necessary in order to even evaluate the Plan.
The second and third categories of objection — whether the Plan’s treatment of surety contracts complies with Carpenter and Insurance Law § 7434 (a) (1) — implicate a threshold legal question: whether surety claims are entitled to class two priority status under Insurance Law § 7434 (a) (1) (ii). If surety claims are entitled to class two status in liquidation, the Rehabilitator’s exclusion of surety claims from the definition of “Claims under Policies” would result in surety claimants receiving less favorable treatment in rehabilitation than they would in liquidation. Such a conclusion would also mean that the Plan disadvantages the subclass of class-two claimants who assert surety claims, thereby implicating Insurance Law § 7434 (a) (1).
A hearing on the order to show cause was held on April 27, 2012. All in attendance agreed with the court that an appropriate starting point for review of the Plan of Rehabilitation would be a ruling on the threshold question of whether surety claims are entitled to class two priority in liquidation pursuant to Insurance Law § 7434 (a) (1). This decision and order follows. Analysis
A. Statutory Background
Prior to the 1999 amendments to Insurance Law § 7434, New York law did not divide the claimants and creditors of an insolvent insurer into priority classes. Subject to limited exceptions not relevant here, all creditors of an insolvent insurer— including policyholders, security and guaranty funds, trade suppliers and holders of reinsurance claims — shared ratably in the liquidation estate after the payment of administrative expenses (see Matter of Union Indent. Ins. Co. of N.Y., 2009 NY Slip Op 30387[U] [Sup Ct, NY County 2009]). This system of pro rata distribution was found to have created at least three problems: (1) the disposition of complex reinsurance claims delayed the *534 closing of liquidation estates; (2) New York’s distribution process was out of conformity with federal law and the laws of our sister states; and (3) the use of an insolvent insurer’s assets to pay claims for “taxes and assessments, reinsurance claims, or claims for goods and services” diminished the funds available for insurance policyholders and security and guaranty funds (Sponsor’s Mem, Bill Jacket, L 1999, ch 134, at 6 [McConnell aff, exhibit 6]; Matter of Union Indent., supra).
In an effort to address these concerns, the State Legislature amended Insurance Law § 7434 in 1999 to establish nine priority classes (L 1999, ch 134 [chapter 134]). Every claim in a priority class must be paid in full before claims in a lower priority class receive any payment (Insurance Law § 7434 [a] [1]). And by prohibiting the establishment of subclasses, the statute requires all claims within the same priority class to be treated in a like manner (id.).
At issue here is whether surety claims are entitled to class two priority, as defined by Insurance Law § 7434 (a) (1) (ii). Class two claims receive priority over all claims other than administrative expenses. If surety claims do not fall within class two, then they fall into class six, the broad catchall for the unsecured “[c]laims of general creditors” (id. [a] [1] [vi]), except for the claims of the federal government and state or local government, which fall within classes three and five respectively. Class two claims are defined in Insurance Law § 7434 (a) (1) (ii) as follows: “All claims under policies including such claims of the federal or any state or local government for losses incurred, third party claims, claims for unearned premiums, and all claims of a security fund, guaranty association or the equivalent except claims arising under reinsurance contracts.” The Rehabilitator’s definition of “Claims under Policies” draws upon this statutory definition, but adds language limiting “policies” to those “of insurance.”
B. Prior Litigation
This court previously addressed the class priority of surety contracts in the context of claims asserted by the Kentucky Coal Employers’ Self-Insurance Guaranty Fund and the Department of Workers’ Claims of the Commonwealth of Kentucky (Kentucky Coal claimants). In response to an argument made by the Rehabilitator, the court determined, on a provisional basis, that surety claims were entitled to class two priority (Matter of Frontier Ins. Co., Nov. 16, 2009, receivership No. FICSUR060012). However, the court invited reargument, and upon *535 the Rehabilitator’s application, vacated its provisional ruling and declined to decide this “important question [ ] of first impression under New York law” (Matter of Frontier Ins. Co., Dec. 16, 2010, receivership No. FIC-SUR060012). The court reasoned that the priority to be accorded to surety claims and the applicability of Insurance Law § 7434 (a) (1) in the context of a rehabilitation proceeding raised “novel questions of considerable importance to the insurance industry that were not adequately presented to the Court in the prior motion practice and were not strictly necessary to resolve the issues presented for determination” (id.).
Accordingly, the court does not rely upon its prior, vacated determination in any respect herein and considers these issues de novo with the benefit of the additional legal arguments ably presented by the attorneys for the Rehabilitator and the interested parties.
C. Analysis
In any case involving a question of statutory interpretation, it is the duty of the court to “discern and give effect to the Legislature’s intent” (Matter of Ramroop v Flexo-Craft Print., Inc., 11 NY3d 160, 166 [2008]). “As the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof’ (Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 583 [1998]). “[W]here the language of a statute is clear and unambiguous, courts must give effect to its plain meaning” (Pultz v Economakis, 10 NY3d 542, 547 [2008] [internal quotation marks omitted]).[5]
The court therefore begins, as it must, with the text of Insurance Law § 7434. Class two claims broadly are defined as “[a]ll claims under policies,” except for “claims arising under reinsurance contracts” (Insurance Law § 7434 [a] [1] [ii]). While the term “policy” is not defined in Insurance Law § 7434 or elsewhere in article 74, the term ordinarily is understood as *536 referring to “a document containing a contract of insurance” (Black’s Law Dictionary [9th ed 2009]).
In construing the term “policies,” the court is mindful of the significant distinctions between suretyship and insurance. The “usual view, grounded in commercial practice, [is] that surety-ship is not insurance” (Pearlman v Reliance Ins. Co., 371 US 132, 140 n 19 [1962]). Nonetheless, in enacting the Insurance Law, the New York State Legislature has declared that surety bonds, fidelity bonds, contract bonds, performance bonds and indemnity bonds all represent a “kind[ ] of insurance which may be authorized in this state” (Insurance Law § 1113 [a]). Thus, the Insurance Law defines a “contract of insurance” to include a “contract of warranty, guaranty or suretyship” (id. § 1101 [a] [1], [3]), so long as it is made “as a vocation and not as merely incidental to any other legitimate business or activity” (id. [b] [1] [B]).
In addition to defining suretyship as a “kind of insurance” under New York law and a surety bond as a “contract of insurance,” the State Legislature has determined that surety obligees denied payment due to an authorized insurer’s insolvency are entitled to receive the protection of the State’s Property/ Casualty Insurance Security Fund (Security Fund) in the same manner and to the same extent as other insurance policyholders. Thus, article 76 of the Insurance Law defines an “insurer” to include an entity authorized to issue surety bonds and defines the term “policy” to include surety bonds (id. § 7602 [c], [d]; see id. § 7603 [a] [1] [B]). In fact, for purposes of article 76, the Legislature defined “policy” by reference to the insurance products emanating from an authorized insurer, consistent with the ordinary meaning of the term (see id. and supra).
Accordingly, the question before the court is not whether suretyship is insurance under New York law or whether a surety bond is an insurance contract. Through its enactment of the Insurance Law, the State Legislature has clearly and expressly answered these questions in the affirmative. And as the Court of Appeals explained long ago: “All insurance in this State . . . is that which the authoritative cases in this State and our Legislature define it to be” (Davis Yarn Co. v Brooklyn Yarn Dye Co., 293 NY 236, 247 [1944]).
Rather, the narrower argument advanced by the Rehabilitator is that while suretyship may be a “kind of insurance” and surety bonds “contracts] of insurance,” surety claims are not claims under “policies,” as the Legislature used such term in *537 Insurance Law § 7434 (a) (1) (ii). In making this argument, the Rehabilitator asserts that surety instruments generally are referred to as “surety bonds” or “surety contracts” in the Insurance Law and elsewhere. Accordingly, the Rehabilitator reasons that the Legislature’s use of the term “policy” in Insurance Law § 7434 (a) (1) (ii) — unaccompanied by any reference to, or express inclusion of, “surety bonds” or “surety contracts” — demonstrates an intention to exclude surety claims from class two priority. For the reasons that follow, the court disagrees.
As an initial matter, the Rehabilitator’s argument is refuted to some extent by other provisions in the Insurance Law that refer to surety bonds as “policies,” as well as by the Superintendent’s own implementing regulations. Insurance Law § 2307 (b) requires the Department of Financial Services to preapprove the form of insurance “policies.” In agency regulations predating the enacting of chapter 134 by more than two decades, the Superintendent recognized that “surety bond forms,” “surety bonds” and “court fiduciary and judicial bonds” all constitute a type of insurance “policy” within the meaning of the Legislature’s enactment (see Insurance Department Regulations [11 NYCRR] § 66.0).[6] Moreover, while surety instruments are most commonly referred to as “surety bonds” within the Insurance Law, the Legislature also has described them as “surety policies” on occasion (see Insurance Law § 3426 [Z] [2]).
The treatment of surety bonds as policies of insurance under New York law is further evidenced in the decisions of our State’s appellate courts. Thus, almost a century ago, the Court of Appeals explained: “Although the instrument denominates itself a ‘bond,’ it is a contract or policy of insurance” (First Natl. Bank of E. Islip v National Sur. Co., 228 NY 469, 472 [1920] [emphasis added], citing People ex rel. National Sur. Co. v Feitner, 166 NY 129 [1901]). To similar effect is a more recent pronouncement of the Appellate Division, First Department, predating the enactment of chapter 134 by only three years: “A [surety] bond is treated as a policy of insurance” (Matter of Union Indent. Ins. *538 Co. of N.Y., 225 AD2d 379, 379 [1st Dept 1996] [emphasis added], affd 92 NY2d 107 [1998]).[7]
Against this backdrop of the State Legislature having defined suretyship as a “kind of insurance” and a surety bond as a “contract of insurance,” the legislative precedent for using the term “policy” to include surety contracts, the Superintendent’s long-standing construction of the statutory term “policy” as including surety contracts, and the New York appellate decisions referring to and construing surety “bonds” as “policies,” it is clear that the Legislature used the term “policy” within Insurance Law § 7434 (a) (1) (ii) in its ordinary sense of referring to “a document containing a contract of insurance” (Black’s Law Dictionary [9th ed 2009]). And there is no question that a surety bond is a contract of insurance under New York law. Accordingly, the Rehabilitator’s argument that the Legislature’s use of the term “policy” was intended to exclude surety claimants from class two priority sub silentio is unconvincing.
Indeed, where the Legislature intended to exclude a particular type of insurance contract from class two priority, it said so directly. Thus, Insurance Law § 7434 (a) (1) (ii) expressly excludes from class two “claims arising under reinsurance contracts.” This exclusion of “reinsurance contracts” from claims under “policies” is particularly significant in light of the fact that reinsurance agreements, like surety contracts, generally are not referred to as “policies” in the Insurance Law (see e.g. id. § 7402 [d] [“contract of reinsurance”]; § 7405 [c] [“reinsurance contract”]; § 7425 [d] [“reinsurance agreement”]).
In fact, there is nothing in the legislative history of chapter 134 supporting the notion that the Legislature intended to treat claims under surety insurance less favorably than other insurance claims. Rather, the legislative history refers generally to the need to protect the interests of insureds, while relegating the claims of general creditors of the insolvent insurer, such as those for “taxes and assessments . . . [and] goods and services,” to a lower priority status (see Sponsor’s Mem, Bill Jacket, L 1999, ch 134, at 6, supra). And where a particular type of insurance was to be excluded from class two, the legislative history of chapter 134 specifically references the exclusion and articulates the Legislature’s policy rationale for it.
*539 Belatedly, the Rehabilitator fails to articulate a persuasive basis for the Legislature to have treated surety claimants no better than general unsecured creditors of an insolvent insurer. While the surety and fidelity claims pending against Frontier arise from varied factual circumstances, many of these insurance contracts were mandated by federal or state law to secure important financial and legal obligations. By way of example, the Kentucky Coal claimants seek to recover against surety bonds given by self-insured employers for the purpose of assuring continued workers’ compensation payments to injured coal workers. The bonds that Gallon Petroleum seeks to recover upon were given to secure funding for environmental remediation and cleanup costs. And the bonds given in favor of the United States served to promote compliance with our nation’s immigration and customs laws.[8] Indeed, the inclusion of surety claims within article 76 and the Security Fund, which serves to protect surety claimants from the inability of an authorized insurer to meet its obligations due to insolvency, is strong evidence of the Legislature’s recognition of “the importance of [surety] insurance coverage to individuals and to society” (see Sponsor’s Mem, Bill Jacket at 6).[9]
In light of this compelling demonstration that the Legislature used the term “policy” within Insurance Law § 7434 (a) (1) (ii) in its ordinary sense as referring to a document evidencing a contract of insurance, the Rehabilitator attempts to support his cramped construction of the term “policy” by reference to a single out-of-state judicial decision.
In Grode v Mutual Fire, Mar. & Inland Ins. Co. (132 Pa Commw 196, 572 A2d 798 [1990]), the Commonwealth Court of *540 Pennsylvania, a trial-level court, determined that certain surety contracts were not entitled to the same priority in liquidation as claims made under traditional risk-insurance policies. In reaching this conclusion, the Commonwealth Court first relied upon “the fundamental differences . . . between bilateral contracts of insurance and tripartite surety bond agreements,” concluding that “surety bonds are in the nature of commercial guarantee instruments rather than policies of insurance” (132 Pa Commw at 213, 572 A2d at 806). Second, while recognizing that Pennsylvania regulated the issuance of surety bonds, the Grode court nonetheless adopted “the usual view, grounded in commercial practice, that suretyship is not insurance” (132 Pa Commw at 214, 572 A2d at 806, quoting Pearlman, 371 US at 140 n 19). And even accepting “that surety bond coverage might be regarded as insurance because it is regulated by the Commonwealth insurance laws,” the court found “no abuse of discretion in subordinating the claims of the [obligee] lenders, who have recourse against investors through their own collection efforts, to those of policyholders, who will recover only what they can from [the insolvent insurer’s] estate and guarantee funds” (132 Pa Commw at 214, 572 A2d at 807). Finally, the Grode court relied upon the fact “the legislature has excluded [surety claims] from coverage under The Pennsylvania Insurance Guaranty Association Act,” reasoning that “[t]his exclusion evidences an intent not to afford surety holders the protections given ... to consumers of insurance” (id.).
This court concludes that Grode is distinguishable and, in any event, lacks persuasive force under the principles of New York law articulated herein. In denying surety claimants the protections accorded to other insurance beneficiaries, the Grode court attached particular significance to the decision of the commonwealth’s legislature to exclude surety bonds from its guaranty association act (id.). In contrast, New York’s Legislature clearly and unambiguously included surety claims within the ambit of its Security Fund, thereby evincing a contrary intention to protect surety claimants.
Further, while Grode relied upon certain basic differences between surety and insurance products, all insurance in New York “is that which the authoritative cases in this State and our Legislature define it to be . . . and has nothing to do with what would popularly be thought to be [insurance]” (Davis Yarn, 293 NY at 247-248). Having previously declared that suretyship is a “kind of insurance” and a surety bond a “contract of insur *541 anee,” our State Legislature enacted chapter 134 secure in the knowledge “that surety bond coverage [is] regarded as insurance” in New York (Grode, 132 Pa Commw at 214, 572 A2d at 807) and that a surety contract generally is deemed to be a “policy of insurance,” despite its frequent denomination as a “bond” (First Natl. Bank, 228 NY at 472 [internal quotation marks omitted]).
Finally, it is important to note that the Grode opinion addressed only one particular type of surety instrument: a “Financial Surety Bond for Limited Partnerships,” which insured lenders against investor defaults in connection with commercial loans (132 Pa Commw at 213-214, 572 A2d at 806). The Commonwealth Court found “no abuse of discretion in subordinating the claims of the lenders” under these “commercial guarantee instruments” because of the obligee-lenders’ “recourse against investors through their own collection efforts” (132 Pa Commw at 214, 572 A2d at 807). Here, in contrast, the issue is one of pure statutory construction, there is no discretion to “circumvent the [statutory] priority classes” based upon the equitable considerations seemingly relied upon in Grode (Insurance Law § 7434 [a] [1]), many of the claims against Frontier involve bonds required by federal or state law to serve important governmental objectives, and most claimants lack any practical recourse against their principals.
Accordingly, this court joins the New Jersey courts in rejecting Grode (see Matter of Liquidation of Integrity Ins. Co., 251 NJ Super 501, 598 A2d 940 [Ch Div 1991]).[10]
Based on the foregoing, the court concludes that in construing Insurance Law § 7434 (a) (1) (ii), the term “claims under policies” includes claims under “fidelity and surety insurance,” as such term is defined in Insurance Law § 1113 (a) (16).
Conclusion
Having determined that surety claims are entitled to class two priority in liquidation, the court concludes that the proposed Plan of Rehabilitation accords surety claimants with less favorable treatment than they would receive in liquidation, in contravention of Carpenter and the principles of federal constitutional law articulated therein. While the court recognizes the deferential standard of review applicable to the *542 Rehabilitator’s actions, a plan of rehabilitation cannot be approved where it is inconsistent with law (see CPLR 7803 [3]).[11]
Under the circumstances, the court therefore disapproves the Plan and remits the matter to the Rehabilitator to allow him to exercise his sound discretion in the first instance. He may propose a revised plan of rehabilitation consistent with the legal principles set forth herein. Alternatively, if he and the Superintendent deem further efforts to rehabilitate Frontier to be futile in light of the inclusion of surety claims within class two, the Superintendent may apply to this court for an order of liquidation (Insurance Law § 7403 [c]).
Finally, in view of the relatively short time frames contemplated for the foregoing actions, the court denies the oral application of the Kentucky Coal claimants for an order divesting the Rehabilitator of the authority to continue to pay “Claims under Policies,” as such term is used within the Plan. However, should significant delays result, the court will entertain appropriate applications for relief.
Accordingly, it is ordered that the Rehabilitator’s application for approval of the Plan of Rehabilitation is denied, and the matter is remitted to the Rehabilitator for further proceedings in accordance with this decision and order; and it is further ordered that within 60 days from the date of this decision and order, either: (a) the Rehabilitator shall develop a revised plan of rehabilitation in accordance with the legal principles set forth herein and apply for judicial approval of said plan; or (b) the Superintendent shall apply for an order of liquidation; and it is further ordered that any such application shall be made in the same manner and upon the same notice as the instant application, provided, however, that notice of the presentment of the order to show cause (and any requests for the extension of the deadlines established herein) shall be given to any interested party who filed comments and/or objections in connection with the instant application; and finally it is ordered that the Rehabilitator shall forthwith: (a) cause this decision and order to be posted on the Liquidation Bureau’s Internet Web site; (b) *543 serve this decision and order with notice of entry upon any interested party who filed comments and/or objections in connection with the instant application; and (c) provide such notice to other interested parties, including claimants and creditors of Frontier, as he deems appropriate; and finally it is ordered that any relief not granted herein is denied.

. At the time, the agency charged with regulating insurance in New York State was the Insurance Department, and the head of that agency was known as the Superintendent of Insurance.

. The Plan of Rehabilitation originally was to be filed with the court by October 10, 2010. However, the court extended this deadline on several occasions at the request of the Rehabilitator in order to allow for outside actuarial review of Frontier’s finances and to give the new Superintendent and Special Deputy Superintendent a full opportunity to explore all available options for Frontier.

. Unless the context indicates otherwise, the foregoing instruments hereinafter will be referred to collectively as “surety bonds” or “surety contracts.”

. The court recognizes that the record includes some updated figures, but the exact amount of Frontier’s current insolvency is not material to disposition of the instant application.

. The Rehabilitator does not argue that his construction of Insurance Law § 7434 (a) (1) (ii) is entitled to any special deference. In any event, where, as here, “ ‘the question is one of pure statutory reading and analysis, dependent only on accurate apprehension of legislative intent, there is little basis to rely on any special competence or expertise of the administrative agency’ ” (Roberts v Tishman Speyer Props., L.P., 13 NY3d 270, 285 [2009], quoting Kurcsics v Merchants Mut. Ins. Co., 49 NY2d 451, 459 [1980]). Similar considerations compel the denial of the oral application of Gallon Petroleum for an evidentiary hearing on the issue of statutory construction addressed herein.

. Nonetheless, the Superintendent exercised his discretion under subdivision (c) of the cited statute to waive the requirement of filing and preapproval with respect to surety policies based upon the unique characteristics of those transactions (id.).

. Contrary to the Rehabilitator’s contention at oral argument, nothing in Judge Bellacosa’s majority opinion for the Court of Appeals is inconsistent with the foregoing.

. To be sure, some of the claims derive from efforts to secure ordinary commercial transactions, such as the sale of a business. However, neither the Rehabilitator nor any objector maintains that Insurance Law § 7434 (a) (1) (ii) distinguishes between or among different types of surety instruments.

. In this connection, the court notes that the claims of the Security Fund expressly are accorded class two priority status in liquidation (Insurance Law § 7434 [a] [1] [ii]). As several interested parties observe, this means that when the Security Fund is “used in the payment of allowed claims remaining unpaid, in whole or in part, by reason of the inability due to insolvency of an authorized insurer to meet its insurance obligations under [surety] policies” (id. § 7603 [a] [1]), the Security Fund is entitled to recoup such payments in liquidation to the same extent as claimants under traditional policies of risk insurance. Thus, the Rehabilitator’s proposed construction of Insurance Law § 7434 (a) (1) (ii) would result in claims of the Security Fund which derive from surety instruments receiving higher priority in liquidation than identical surety claims asserted directly against the estate of the insolvent insurer.

. It is noteworthy that the New Jersey courts reached this conclusion despite the fact that surety claims are not covered by that state’s guaranty association (251 NJ Super at 504-505, 598 A2d at 942-943).

. In view of the foregoing, it is unnecessary to address the issue of whether and to what extent Insurance Law § 7434 (a) (1) and its prohibition of the creation of subclasses applies in the context of an ongoing rehabilitation proceeding. Clearly, the Plan’s treatment of surety claimants has the effect of disadvantaging the subclass of class two claimants asserting surety claims. It is further unnecessary to address the other legal, fiscal and policy arguments offered in opposition to the Plan.